# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

FEB 26 2015

U.S. DISTRICT COURT
ELKINS WV 26241

**JEFFREY SCOTT HARDMAN,**
    **Plaintiff,**

v.                                    **Civil Action No. 5:14-cv-132**
                                      **(The Honorable Frederick P. Stamp)**

**COMMISSIONER OF SOCIAL SECURITY,**
    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying

Plaintiff Jeffrey Scott Hardman's ("Plaintiff") claim for disability insurance benefits ("DIB") under

Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary

judgment and has been referred to the undersigned United States Magistrate Judge for submission

of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ.

P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on July 13, 2011, alleging disability since July 21,

2005,[1] due to "constant left side head pain" (R. 143-44, 161). Plaintiff's application was denied at

the initial and reconsideration levels (R. 81, 82, 88-98, 100-06). Upon Plaintiff's request, a hearing

was held by Administrative Law Judge Karen Kostol on April 10, 2013. Plaintiff, represented by

counsel, Ambria Adkins, testified on his own behalf. Also testifying were Vocational Expert Larry

Bell ("VE") and Plaintiff's wife (R. 27-74). On May 10, 2013, the ALJ entered a decision finding

---

[1] The Administration documented, and the ALJ considered, an alleged onset date of May
31, 2009 (R. 15, 158).

Plaintiff was not disabled (R. 13-22). On August 8, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. FACTS

Plaintiff was born on June 20, 1969, and was 43 years old at the time of the administrative hearing (R. 32). He has a high school education and past relevant work as a maintenance worker in various positions (R. 162).

On August 4, 2005, Plaintiff was admitted to the emergency room of Nash Health Care Systems in Rocky Mount, North Carolina, for complaints of headache. His pain was most severe in the frontal area; he described his pain as sharp, stabbing, and aching. Plaintiff reported that he had been working in the heat "constantly" and had been experiencing the headache for seven (7) days (R. 314). A normal examination was noted (R. 315). While there, Plaintiff underwent a CT scan of his head; it was normal (R. 318). Plaintiff was diagnosed with a headache, prescribed Fioricet with codeine, and discharged home (R. 315).

On August 25, 2005, Plaintiff had a normal brain MRI (R. 312). He also underwent angiography of his head. Dr. Stephen Ladwig noted that Plaintiff's "right posterior cerebral artery has a 4 x 2 mm aneurysm" (R. 313).

Plaintiff underwent an MRI of his cervical spine on August 27, 2005. Dr. Richard Fritz noted "reversal of the cervical lordosis;" degenerative changes at C1-2; and anterior osteophytic spurring at the C4-5 level. Plaintiff also had mild central disk bulging at C4-5; left paracentral hard disk bulging at C5-6; and right lateral disk bulging at C6-7. Dr. Fritz' impression was as follows: "Reversal of the cervical lordosis. Bony hard disk bulging particularly at the C6 level. No frank herniation is noted" (R. 311).

2

Plaintiff underwent a cerebral arteriogram on August 30, 2005; Dr. Allen Johnson noted that it showed "no evidence of aneurysm" (R. 310).

Plaintiff was admitted to Nash Health Care Systems in Rocky Mount, North Carolina, on September 9, 2005, for "intravenous Dihydroergotamine and Reglan for status migrainous." Plaintiff had been "suffering from an intractable headache for several weeks unresponsive to multiple analgesics and two rounds of corticosteroids." He had a positive response to the first round; however, "subsequently he got worse and required the use of opiate analgesics." Plaintiff got a "good nights rest with Ambien." Dr. Gerrie Shiver diagnosed refractory migraine/status migranous; elevated liver transaminases; moderate diastolic hypertension; and steroid-induced acneform rash. She prescribed Doxepin and Ambien, and noted a "guarded" prognosis as to Plaintiff's headaches. Plaintiff was discharged on September 10, 2005, and was instructed to follow up with Dr. William Deans in two (2) weeks (R. 308-09).

On October 6, 2005, Plaintiff saw Dr. Bennie Jarvis of Carolina Otolaryngology. Plaintiff had a continuous headache "above his left eyebrow" which radiated to the top of his head. Plaintiff had tried narcotic injections, Phenergan, and migraine medications with no relief. Plaintiff's wife questioned whether there could be an underlying sinus condition (R. 292). Dr. Jarvis noted a normal examination (R. 293). While there, Plaintiff underwent a CT scan of his sinuses. Dr. Jarvis' impression was for "small cysts bilateral maxillary sinus" (R. 295). He assessed headache and "2- cyst of sinus (nasal)." Dr. Jarvis thought that Plaintiff's headache was most consistent with a cluster headache. He reassured Plaintiff that the small cyst in his sinus "usually remains asymptomatic and would not be causing headache location" (R. 293).

On October 21, 2005, Plaintiff saw Dr. J. Gregg Hardy of East Carolina Neurology. Plaintiff

3

had been working for the City of Rocky Mount, North Carolina, three (3) months ago and got "'heat stroke.'" He went to the emergency room, did not receive any fluids, and became "dizzy and weak." A week later he "developed a left frontal hemicranial headache that has been persistent since." Plaintiff's pain varied from a five (5) to a ten (10) on a ten-point scale. Plaintiff's wife stated that Plaintiff's headaches sometimes lasted "as much as 24 hours." Plaintiff had some trouble with insomnia because of the headaches. He had tried "[m]ultiple medications, including Indocin, Topamax, Depakote, Toradol, triptans, Reglan, and Neurontin (R. 234). Dr. Hardy's examination revealed no abnormalities. He noted that the "differential diagnosis could be a continuous, chronic hemicranial migraine." Dr. Hardy stated that "[p]sychophysiological concerns related to depression are a possibility." Plaintiff had a flat affect and did not "present as someone who is in excruciating pain today" (R. 235).

Plaintiff saw D.C. Steven Garzone at Rocky Mount Chiropractic for a consultation and examination on May 17, 2006. Plaintiff complained of a "flare-up" of headache pain. The pain radiated from his left eye region and forehead. He described his pain as a "'hammer going to the forehead' and at times feeling like an 'icepick.'" D.C. Garzone conducted orthopedic testing of Plaintiff's cervical spine. He noted that Plaintiff had "moderate hypertonicity of the posterior cervical muscular upper trapezius and levator scapula." Plaintiff also had "generalized decreased cervical range of motion" and fixation throughout the "cervical spine and upper thoracic region." D.C. Garzone's assessment was for cervical fixation/dysfunction as well as muscle hypertonicity. Plaintiff was to receive treatment for three (3) weeks, two (2) to three (3) times per week (R. 319).

The next day, Plaintiff told D.C. Garzone that he had a severe headache last evening. He did not fall asleep until 5:00 a.m. Plaintiff was still sore on the right side of his neck; he did get some

relief from his first visit, but then the pain returned. D.C. Garzone noted that Plaintiff's condition was "relatively unchanged." He used a "diversified adjustive technique" on Plaintiff's cervical and thoracic spinal regions. On May 19, 2006, Plaintiff told D.C. Garzone that his headache pain was down from an eight (8) to a seven (7). D.C. Garzone noted "minimal improvement" from the day before and used the diversified adjustive technique on Plaintiff's cervical and thoracic spine (R. 320).

On May 23, 2006, Plaintiff told D.C. Garzone that he "felt about the same" over the weekend. His headache was at an eight (8) to ten (10). D.C. Garzone found that Plaintiff's condition remained "relatively unchanged." He used the diversified adjustive technique on Plaintiff's cervical and thoracic spine. The next day, Plaintiff reported that his pain was at a ten (10), but that it "sometimes gets down to 8/10." Plaintiff would do "anything" to decrease his pain. D.C. Garzone noted that Plaintiff's condition remained "relatively unchanged" and used the diversified adjustive technique on Plaintiff's cervical and thoracic spine. He also massaged Plaintiff's scalp muscle (R. 320-21).

On August 14, 2006, Plaintiff saw Dr. Charles Matthews at the North Carolina Comprehensive Headache Clinic. Plaintiff had been taking Diazepam; it had "essentially no effect" on his sleep. He extended sleep by one hour by taking Seroquel. Plaintiff slept in a recliner; he felt "restless" and got up "with pain." Plaintiff's headaches seemed to be exacerbated by heat exhaustion. Dr. Matthew's assessment remained "[u]nchanged from previously." He increased Plaintiff's Seroquel dosage and prescribed Methergine. He advised Plaintiff to continue vitamin D supplementation. Plaintiff was to undergo a second MRI. Dr. Matthews opined that Plaintiff was "currently able to perform his activities at work" and wrote a letter to Plaintiff's employer (R. 236).

5

Plaintiff returned to see Dr. Matthews on August 30, 2006. His headache had been at a ten (10) for a few weeks. Plaintiff described "a band from the left eye up over the left hemicranium." He had stopped taking Seroquel and Methergine because he felt they were "not effective." Plaintiff still had "significant sleep disturbance, averaging 0 to approximately 4 hours depending upon pain levels." Dr. Matthews noted an unremarkable examination and assessed side-locked left-sided continuous headache; severe insomnia; and severe hypovitaminosis-D. He prescribed Inderal. Dr. Matthews suggested possible zygomaticotemporal blocks; Plaintiff was reluctant because he had experienced "such a negative response to a supraorbital block." Dr. Matthews suggested neuropsychological testing to help "sort out his presentation" (R. 237).

Plaintiff underwent an MRI of his cervical spine on January 31, 2008. Dr. Ivan Peacock noted "loss of signal within the C4-5 and C5-6 intervertebral disks consistent with desiccation." The images also showed "a shallow disk bulge at C4-5 level which minimally encroaches upon the anterior dural sac and lateral recesses." Plaintiff also had "a diffused disk bulge with small osteophytes associated with the uncovertebral joints bilaterally" (R. 298). His impression was for "[s]pondylitic changes at C4-5 and C5-6 levels, demonstrating progression at C5-6 since the prior study of August 05" (R. 299).

Plaintiff returned to see D.C. Garzone on February 6, 2008. Plaintiff had been raking leaves at work and "began having pain in the neck that radiated down the left arm into the fingers." He also had a headache. Upon examination, D.C. Garzone noted "tenderness to palpation" of the left cervical region; moderate hypertonicity of the left upper trapezius, left levator scapula, and cervical paraspinal musculature; and fixation/aberrant segmental motion throughout Plaintiff's mid and lower cervical and upper thoracic spine. Plaintiff's condition remained "relatively unchanged," and D.C.

Garzone used the diversified adjustive technique on Plaintiff's cervical and thoracic spine. On February 11, 2008, Plaintiff told D.C. Garzone that he was having sharp pain and that his pain had increased from "driving a lot" over the past weekend. There was "no notable change" to Plaintiff's condition, and D.C. Garzone used the diversified adjustive technique on Plaintiff's cervical and thoracic spine (R. 321).

Plaintiff saw Dr. Matthews again on October 2, 2008. Plaintiff's wife said that they could not afford other doctors and that Plaintiff was unable to sleep because of pain. Plaintiff did "not feel right" when he took Inderal; his pulse was 48 and his blood pressure was low. Plaintiff felt "weak" when he took Inderal. His employer had terminated him and cancelled his insurance. Plaintiff's wife did not think that medications would help and did not want any procedures done. She said they could not afford neuropsychological testing. Plaintiff reported "severe sleep disturbance" and not being able to do "things with children because he becomes hot." Dr. Matthews noted an unremarkable examination and stated that Plaintiff did "not appear particularly lacking in sleep." He assessed severe hypovitaminosis-D, under replenishment, and noted that "[d]escriptions of his symptoms are more generalized and difficult to interpret." Dr. Matthews gave Plaintiff samples of Lunesta and had "nothing more to offer them at this point" (R. 238).

Plaintiff returned to see Dr. Matthews on June 9, 2008. Plaintiff and his wife expressed their feelings that no other medications were going to help Plaintiff "at all." Plaintiff had been terminated from his position as a maintenance worker. Dr. Matthews noted that UNC had recommended neuropsychological testing, and that Plaintiff had been diagnosed with "New Daily Persistent Headache" related to an episode of heat exhaustion. Plaintiff reported that he had experienced "some improvement for a few months," but that when temperatures reached the 70s, his headache recurred.

He reported increased pain and more intensity. Plaintiff had been experiencing nausea and vomiting "consistent with a new migrainous component." Upon examination, Dr. Matthews noted that Plaintiff's cranial nerves, limb mobility, tone, and reflexes remained unchanged "from previously." He assessed possible new daily persistent headache and noted a previous determination of severe hypovitaminosis-D. He recommended that Plaintiff proceed with neuropsychological testing. Dr Matthews noted that using Botox was a possibility and that Plaintiff should be "restricted from working outside of an air-conditioned environment" (R. 284).

Plaintiff underwent an X-ray of his lumbar spine at United Hospital Center ("UHC") on March 11, 2009. Dr. Mark Hackney noted "decreased disc height at L5-S1 with mild endplate degenerative change." Plaintiff also had some "[o]steophyte formation" at the "anterior-superior endplate of L5." Dr. Hackney's impression was for "[m]ild degenerative changes in the lower lumbar spine as described above with no acute abnormality" (R. 249).

Plaintiff underwent an MRI of his lumbar spine on March 19, 2009, at UHC. Dr. Thomas Koay noted "mild broad-based disc protrusion in the right paracentral space" with no significant stenosis at L4-L5. Plaintiff had "moderate disc space narrowing and degenerative disc signal with moderate diffuse disc bulge" at L5-S1 with no significant stenosis. Dr. Koay's impression was for "[m]oderate degenerative changes at L5-S1 with diffuse disc bulge" and "L4-L5 mild right paracentral disc protrusion without significant stenosis" (R. 248).

Plaintiff was admitted to the emergency room at UHC on May 10, 2009, with complaints of "head pain" around his left eye "from eyebrow to top of head" (R. 241). He rated his pain as a ten (10); his pain was constant and like a "twisting knife" (R. 242). The treating doctor assessed headache (R. 244). Staff noted that Plaintiff's symptoms appeared to be "from a benign (non-

serious) headache" and that he could be treated at home (R. 247).

Plaintiff established care with Dr. Alvaro Gutierrez on May 12, 2009, for his headaches. Plaintiff had failed multiple prior treatments; he had experienced chronic daily headaches continuously for two (2) years. Plaintiff's headaches were "unilateral left periorbital, spreading from the left infraorbital area to the top of the calvarium no further than the crown." Plaintiff described his pain as "achy" and "stabbing." Plaintiff was receptive to Botox (R. 252). Dr. Gutierrez did not note any abnormalities after examining Plaintiff (R. 253-54). He assessed new daily persistent headache (R. 252).

Plaintiff returned to see Dr. Gutierrez on May 15, 2009. His examination was normal (R. 256-57). Dr. Gutierrez injected 100 units of Botox into Plaintiff's procerus and periorbital areas on the left infraorbital area (R. 255).

On June 4, 2009, Plaintiff told Dr. Gutierrez that he had experienced "no improvement whatsoever" after receiving the Botox injections. The spread, intensity, and persistence of his headaches had not changed (R. 258). Plaintiff's examination was normal (R. 259-60). Dr. Gutierrez assessed new daily persistent headache and prescribed Trileptal. He also performed a nerve block on Plaintiff's greater and lesser occipital nerves. Plaintiff acknowledged "only a 20% reduction in the intensity of the ongoing pain" five (5) to ten (10) minutes after the procedure (R. 258).

Plaintiff returned to see Dr. Gutierrez on July 21, 2009. Taking Trileptal had "essentially no impact on the intensity spread or any other feature of the headaches." Plaintiff was "unable to work given the distraction that the pain provokes." He had used a TENS unit in the past; he reported that it only aggravated the pain (R. 261). Plaintiff's examination was normal (R. 262-63). Dr. Gutierrez assessed new daily persistent headache and prescribed Venlafaxine and Ativan. He wanted to

"recruit the help of Dr Watson" and potentially consider an "occipital nerve pacer" (R. 261).

On October 16, 2009, Dr. David Watson of the WVU Headache Center wrote a letter to Dr. Alvaro Gutierrez. Dr. Watson had seen Plaintiff that day for a consultation. Plaintiff complained of a "4-year history of chronic daily headache." Plaintiff's pain felt "like someone has stuck a knife into his head and his moving it back and forth" between his left eye and the top of his head. Plaintiff's pain was "at baseline 5/10 and 4-5 times a week would become a 10/10 when it feels like the knife is not only being moved but also being twisted" (R. 285). Plaintiff's face showed when he was experiencing a headache, and he sometimes had "minimal droopiness" of his left eye. Plaintiff did not know what alleviated or aggravated his headaches. The pain woke him up from sleep at times, but he did not have any agitation with pain. Plaintiff was taking Ativan but did not find it to be "very effective." He had tried "a number of medications" before as well as lidocaine and Botox injections and acupuncture. Plaintiff had received an occipital nerve block which gave him "a few hours of some relief," but then the pain "came back just as bad if not worse" (R. 286).

Dr. Watson thought that Plaintiff was describing a "chronic daily headache, which has some features of primary stabbing headache, some features of hemicrania continua." He did not have typical features of cluster, migraine, or any other headache patterns (R. 286). Plaintiff was unwilling to start "any new maintenance medication as he had been on a number of them." Dr. Watson would consider a retrial of indomethacin, "pushing the dose fairly high." He also thought a calcium channel blocker was an option. Other options included Namenda, a lidocaine infusion, and "something like Cymbalta or another SNRI." Dr. Watson prescribed Tizanidine to use "on an as needed basis when the headache becomes more severe." Plaintiff was to follow up in three (3) months (R. 287).

On July 1, 2011, Plaintiff saw Dr. Watson. Plaintiff told Dr. Watson that his headaches had

not changed. He was taking nothing for prevention and used Excedrin as needed. Plaintiff experienced seven (7) severe headaches per week; he had no headache-free days. Plaintiff rated his headaches as a seven (7) or eight (8) out of ten (10); he experienced "pounding pain" and "stabbing pain briefly." Plaintiff's headaches were unilateral in the left frontal area, left temporal area, and left occipital area. His sleep was "frequently" disrupted by headaches (R. 264). Upon examination, Dr. Watson noted that Plaintiff was "normocephalic and atraumatic." He had good memory, attention, knowledge, and language. A cranial nerve exam revealed "equal and reactive pupils with intact conjugate eye movements, symmetric face, and clear speech, and normal hearing to voice." Plaintiff had a steady gait, intact coordination, and normal strength in all extremities. Dr. Watson diagnosed chronic daily headaches and hemicrania continua, and described Plaintiff's headache as "chronic" and "sidelocked" "without a lot of autonomic features." He prescribed Verapamil and advised Plaintiff to follow up in six (6) months or sooner if need be (R. 265, 287-88).

Plaintiff completed a Function Report–Adult on July 25, 2011. Plaintiff's head pain affected his sleep; he had no problems with personal care (R. 183). Plaintiff prepared meals; he often prepared cereal, Hot Pockets, microwave dinners, and sandwiches. He used to cook outside but could no longer stay outside for "very long." Plaintiff did laundry, vacuumed, and cleaned the house; he did very little outside. His wife encouraged him to try to get moving to do these chores (R. 184). Plaintiff could drive and ride in a car; he could go out alone. He shopped in stores, by mail, and by computer for food and clothes. Plaintiff could count change, handle a savings account, and use a checkbook and money orders; he could not pay bills because he had no income and could not get a job when he told prospective employers about his condition (R. 185). Plaintiff's hobbies included watching television; he did not spend time with others. He sometimes went for a drive with his wife

(R. 186). Before his condition began, Plaintiff was able to go outside and play ball with his son, mow the grass, and swim. He could walk half a block before needing to rest for 15-20 minutes. His condition affected lifting, walking, stair climbing, and completing tasks (R. 187).[2]

Dr. Rogelio Lim completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 9, 2011. He found that Plaintiff could occasionally lift and carry fifty (50) pounds; frequently lift and carry twenty-five (25) pounds; stand, walk, and sit for six (6) hours in an eight (8)-hour day; and had no restrictions with pushing and pulling (R. 267). Plaintiff could occasionally climb ladders, ropes, and scaffolds; he could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 268). Dr. Lim found that Plaintiff needed to avoid concentrated exposure to vibration (R. 270). He stated that Plaintiff's allegations were "not fully credible" (R. 273).

On November 21, 2011, Dr. Narendra Parikshak reviewed Dr. Lim's September 9, 2011, Physical Residual Functional Capacity Assessment and affirmed same (R. 274).

Plaintiff returned to see Dr. Watson on December 5, 2011. He reported that his headaches had "worsened." He was taking nothing for prevention. Plaintiff took Excedrin migraine once a day and used a "hot sock with rice" as needed. Plaintiff's pain was "always present" but could "get worse at times." He experienced spells of falling and altered consciousness. Plaintiff experienced severe headaches seven (7) days a week; he had no headache-free days. His headache was "unilateral in the left frontal area, unilateral in the left temporal area, unilateral in the left occipital

---

[2] Plaintiff's wife completed another Function Report–Adult on Plaintiff's behalf on November 6, 2011. In that report, Plaintiff stated that he helped his wife and son take care of a cat. On a day that Plaintiff was experiencing extreme pain, he stayed in bed. On days where his pain was moderate, he could shower, watch television, do minor household chores, and drive a vehicle (R. 201). Plaintiff went outside a few times a week; he was able to pay bills (R. 203). A few times a week, he talked on the phone or visited with family (R. 204). His conditions affected lifting, squatting, bending, walking, stair climbing, completing tasks, and concentration (R. 205).

area." It was never on the right side, and was a "stabbing, constant pain." Plaintiff had a poor response to abortive medications, and Verapamil caused low blood pressure (R. 275, 289). Dr. Watson noted a normal examination; assessed chronic daily headache and spells; and prescribed Zonegran and Effexor. Dr. Watson stated that Plaintiff's chronic daily severe headaches got worse with "even minimal activity," and that his chronic pain had "also led to what appears to be a significant depression." Dr. Watson opined that Plaintiff was unable to "maintain employment, as his severe pains will cause him to miss work frequently." He was unsure as to how long that would last, but noted that Plaintiff's headaches had been ongoing for six (6) years "despite very aggressive treatment from good neurologists in the past." Dr. Watson discussed the possibility of attending the Jefferson Headache Center in Philadelphia, and instructed Plaintiff to follow up in four (4) to six (6) months or sooner as needed (R. 276, 290).

Plaintiff saw Dr. Michael Angotti on February 7, 2012, for a "follow up for chronic condition." They discussed Plaintiff's headache, persistent insomnia, and an adverse drug reaction. Dr. Angotti prescribed Dilaudid and instructed Plaintiff to return in one (1) month or as needed (R. 279).

Administrative Hearing

Plaintiff testified that he could not work because he spent most of his days "trying to fight the pain from going to the extreme." He also experienced lack of sleep and depression. Plaintiff was not taking any medications for his headaches or depression; he had been on medicine for depression before, but it "made the depression worse" (R. 49). Plaintiff had been seeing Dr. Watson; he did not see him for approximately two (2) years because he and his wife had to file for bankruptcy due to his medical bills (R. 54).

Plaintiff testified that he does not have "typical" days. He would get up and try to make it into the shower. On bad days, he took a shower, ate a bowl of cereal, and sat in his chair with his "hot sock." On "extreme" days he did not get out of bed. He experienced "extreme days" for an approximate total of three (3) weeks per month. His headache never "goes away" (R. 55). When he has taken medications in the past, they caused "[e]verything from hallucinations to itching to breaking out in rashes." Excedrin did nothing for Plaintiff's pain. He described his pain "like somebody's taking a six inch hunting knife and jamming it in my head" (R. 56). That was on good days; on "extreme" days, the pain felt like the knife was being twisted. Plaintiff's pain was an "eight to ten almost ever day;" on "extreme" days the pain was "unbearable" (R. 57).

Plaintiff did not do "really much" around the home; he turned the television on "for noise" and listened to music through headphones. He would sit on the porch to watch his son mow the grass. Plaintiff used to do laundry, but his "wife put a stop to it when [he] fell" (R. 57). Plaintiff's pain affected his concentration, and he had a hard time remembering things (R. 58). During a twenty-four (24)-hour period, Plaintiff would get three (3) hours of sleep, "if that." Sleep depended "on the pain." During the day, he would either sit in bed with his legs crossed, his head back, and a hot sock over his face, or in his recliner with his head "cocked back" and a hot sock on it (R. 59). It hurt to walk and bend over. Plaintiff hardly got up to eat; his wife brought food to him. Plaintiff testified that he did not "have a life"; he could no longer mow grass or play basketball and football with his son (R. 60).

Julia Hardman, Plaintiff's wife and a registered nurse, also testified. She went with Plaintiff to his doctors' appointments "100 percent of the time." She testified that Plaintiff had many problems with medications in the past; they would make him "worse" as to depression, he wouldn't

get out of bed, and they "just really messed him up even more than just having the pain" (R. 61). Plaintiff wanted to find pain relief, but Dr. Watson wouldn't provide pain medications. He went to Dr. Angotti for pain relief, and Dr. Angotti prescribed Dilaudid. However, Plaintiff stopped taking the Dilaudid because it made him itch and did not relieve the pain (R. 62). In 2006-2007, Plaintiff had seen a Dr. Hardy in Greensboro, North Carolina, for pain management; however, Dr. Hardy "didn't offer him anything either" (R. 63). Plaintiff mostly received pain medications from emergency room visits; he would "try to use them to no effect" (R. 64).

Plaintiff's wife worked as a hospice nurse during the week. At least once a week, she went home to check on Plaintiff; her "boss [was] understanding of the situation" (R. 65). Plaintiff "always ha[d] a bad day." On a more severe day, Plaintiff's wife testified that Plaintiff could hardly get out of bed. She did all the cooking; Plaintiff would "heat up" leftovers during the day or eat cereal. Plaintiff's wife did the laundry with help from their son. Going up and down stairs made Plaintiff's pain worse. Their son did most of the outside chores (R. 66). Plaintiff used to be a volunteer firefighter. Plaintiff could not play sports with their son anymore. He left his job with the State of West Virginia at Benedum Airport because he was "missing too many days and they asked him to come in and they didn't want to really have him quit or fire him" (R. 67).

The ALJ then asked the VE the following hypothetical:

Okay. Now I'd ask that you assume an individual with the same age, education and past work experience as the claimant with the following abilities. Said individual is capable of light exertional level work. Said individual can occasionally climb ladders, ropes or scaffolds. Can occasional [sic] perform all other postural activities. Said individual must avoid all exposure to extreme heat and concentrated exposure to excessive vibration and concentrated exposure to hazards such as dangerous moving machinery an [sic] unprotected heights. Said individual is capable of work in a low stress job, defined as having only occasional decision making required, occasional changes in the work setting and no strict production quotas. Can an

15

individual with these limitations perform the claimant's past work?

The VE responded that such an individual could perform Plaintiff's past general office reception work as he performed it at the airport (R. 71). However, that job would not be available if said individual was limited to occasional interaction with the general public, co-workers, and supervisors. However, such an individual could perform work as a garment sorter/marker, with 89,000 positions nationally and 1,000 regionally, and a cleaner, with 350,000 positions nationally and 3,500 regionally. If such an individual were to be off task or miss twenty (20) percent or more of the work week, there would be no jobs available (R. 72).

Evidence Submitted to the Appeals Council

Plaintiff established care at Salem Family Medicine on April 29, 2013. He reported that he had head pain that went "from bottom of left eye to the back of his neck." His pain was constant, and he had experienced such pain for seven (7) years. Plaintiff's pain was "in the left frontal area into occiptial [sic] area sharp to stabbing and ripping at times." His pain had been a five (5) but was now often a ten (10). Plaintiff's pain became worse with "getting hot and activity;" he could not do much without his pain becoming severe. Plaintiff experienced pain daily. He experienced confusion and short-term memory loss (R. 328). Dr. RaEtta Wentz examined Plaintiff; she noted a normal examination. Dr. Wentz assessed headache, prescribed oxycodone, and instructed Plaintiff to follow up in six (6) weeks (R. 329).

Plaintiff saw Dr. Paul Davis at Salem Family Medicine on May 14, 2013, for a two-week follow up. He told Dr. Davis that he had experienced "nausea and vomiting with each dose of Oxycodone." Plaintiff's pain was an eight (8) out of ten (10) with no "obvious triggers." Plaintiff had a headache. Dr. Davis diagnosed chronic pain syndrome and headache, and prescribed

Promethazine. Plaintiff was to return in two (2) weeks (R. 326).

On May 28, 2013, Plaintiff told Dr. Davis that his pain was down to a "5 or 6 out of 10" and that he could "live with that." Plaintiff had a headache. Upon examination, Dr. Davis noted that Plaintiff had a "much improved mood, countenance, conversation." He diagnosed chronic pain syndrome and headache and prescribed OxyContin (R. 324). Plaintiff was to return in one (1) month (R. 325).

Plaintiff returned to see Dr. Davis on June 27, 2013. He reported that his pain was "occasionally down to a 3." Plaintiff was "moving to Carolina." He had a headache. Dr. Davis noted a normal examination and assessed chronic pain syndrome (R. 322). He advised Plaintiff to continue his current pain regimen and maintain a good exercise regimen (R. 323).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Kostol made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since May 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: headaches; and degenerative disc disease of the cervical and lumbar spine (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined

in 20 CFR 404.1567(b) except with the following limitations: can perform all postural activities; must avoid all exposure to extreme heat and concentrated exposure to excessive vibration and hazards such as dangerous moving machinery and unprotected heights; and due to the effects and distraction resulting from headaches; work must be low stress, defined as having only occasional decision making requirements, no more than occasional changes in the work setting, and no strict production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 28, 1969 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2009, through the date of this decision (20 CFR 404.1520(g)).

(R. at 13-22.)

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The

Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contentions of the Parties**

Plaintiff contends:

1.      The ALJ failed to consider all of Plaintiff's severe impairments in her Step Three evaluation;

2.      The ALJ committed reversible error in failing to properly evaluate Plaintiff's depression and resulting functional limitations as required by 20 C.F.R. § 404.1520a; and

3.      The ALJ failed to comply with 20 C.F.R. § 404.1527 in evaluating the medical expert opinions available in the record.

(Plaintiff's Brief at 9-17.)

The Commissioner contends:

19

1.    Substantial evidence supports the Commissioner's final decision that Plaintiff is not entitled to disability benefits;

2.    Substantial evidence supports the ALJ's Step Two analysis; and

3.    The ALJ properly weighed and considered the opinion evidence.

(Defendant's Brief at 9-15.)

## C.    Step Three Determination

As his first claim for relief, Plaintiff asserts that the ALJ's analysis at Step Three of the sequential evaluation was "incomplete." (Plaintiff's Brief at 10.) Specifically, Plaintiff argues that "the ALJ failed to identify any Listing she considered and did not address anywhere in her decision whether Hardman's degenerative disc disease or headaches met or equaled a Listing singly or in combination with his other impairments." (Id. at 11-12.)

When evaluating whether a claimant meets one or more of the listed impairments at Step Three of the sequential evaluation, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). "This requires an ALJ to compare the plaintiff's actual symptoms to the requirements of any relevant listed impairments in more than a "summary way." Id. at 1173. "The ALJ is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings." Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W. Va. Mar. 5, 2009) (citing Warner v. Barnhart, Civil Action No. 1:04-cv-8, Docket No. 18 at 7-9, 11 (Final Order of Stamp, J., filed Mar. 29, 2005)).

In Warner, Judge Stamp found that the ALJ "simply restate[d] verbatim the language of Listing 1.04 and Listing 14.09. Without analysis, the ALJ dismisse[d] the applicability of the

listings:

> The undersigned does not believe that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence of inflamed arachnoidal tissue resulting in the need for change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively. The objective medical evidence also does not show that the claimant had a history of joint pain, swelling and tenderness, with signs of current physical examination of joint inflammation or deformity in two or more major joints resulting in an inability to ambulate effectively or an inability to perform fine and gross movements effectively. The undersigned finds that the claimant did not meet or medically equal any physical listing.

Warner, Civil Action No. 1:04-cv-8, Docket No. 18 at 8.

> At Step Three of the sequential evaluation, the ALJ wrote:

> At step three, the undersigned finds the above combination of impairments to be "severe" since they have resulted in significant limitations on the claimant's ability to perform basic work activities. However, as will be more fully explained below, the record does not establish that the claimant is subject to an impairment or combination of impairments, which meets or equals the requirements of any section of the Listings in Appendix 1, Subpart P, Regulations No. 4.

(R. at 15.)

Here, the ALJ only stated that Plaintiff's impairments did not meet any of the Listings; she did not provide any analysis to support that conclusion. Although the ALJ said that her Step Three determination would "be more fully explained below" (R. at 15), not once did she mention the Listings in her discussion of the subsequent steps of the sequential evaluation. Because of this, the ALJ clearly did not meet the requirements of Cook, as she did not compare Plaintiff's "symptoms to the requirements of any of the [Listings], except in a very summary way." Cook, 783 F.2d at 1173 (alteration in original). As the Fourth Circuit noted in Cook, "[a]dministrative determinations are required to be made in accordance with certain procedures which facilitate judicial review." Id. at 1172. Here, the undersigned finds that the ALJ's Step Three determination is even more deficient

than the one at issue in <u>Warner,</u> and that it provides no explanation that the Court can rely on indicating why Plaintiff does not meet one or more of the Listings.

Given the ALJ's deficient Step Three determination, the undersigned cannot conclude that her determination that Plaintiff did not "have an impairment or combination of impairments that meets or medically equals the severity of the one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" (R. at 15) is supported by substantial evidence. Nor can the undersigned find that such error is harmless "because the Social Security regulations state that if a person's impairments meet or equal a Listing, she is disabled under the regulations and would be entitled to benefits with no further analysis required." <u>Cashin v. Colvin,</u> No. 1:12CV909, 2013 WL 3791439, at *6 (N.D. Ohio July 18, 2013); <u>see also</u> <u>Vest v. Colvin,</u> No. 5:13CV00067, 2014 WL 4656207, at *27 (E.D. Va. Sept. 16, 2014) ("The mere fact that an ALJ properly found a claimant capable of past work at step four or of other work at step five does not render an error at step three harmless; otherwise, step three errors would never be reversible alone, which is clearly not the case."). Accordingly, the undersigned agrees with Plaintiff that the matter should be remanded so that the ALJ can cure the deficiencies of her Step Three determination.

**D.    Depression as a Severe Impairment**

As his second claim for relief, Plaintiff alleges that the ALJ committed reversible error by failing to properly evaluate his depression and resulting functional limitations. (Plaintiff's Brief at 12.) Specifically, Plaintiff asserts that the ALJ's failure at Step Two to "incorporate the special technique described in 20 C.F.R. § 404.1520a(b)-(e) warrants a remand." (<u>Id.</u> at 13.) Plaintiff argues this error "resulted in a deficient residual functional capacity finding and an incomplete hypothetical being posed to the vocational expert." (<u>Id.</u>) The undersigned has already found that the ALJ's Step

22

Three determination is not supported by substantial evidence, warranting remand of Plaintiff's case. Accordingly, the undersigned declines to consider Plaintiff's arguments regarding depression.

**E.     Opinion Evidence**

As his last claim for relief, Plaintiff alleges that the ALJ failed to comply with the Administration's regulations regarding evaluation of medical source opinions provided in the record. (Plaintiff's Brief at 14.) Specifically, Plaintiff asserts that the ALJ did not adequately explain why she assigned "little weight" to the opinion provided by Dr. Watson. (Id. at 15-16.) The undersigned has already found that the ALJ's Step Three determination is not supported by substantial evidence, warranting remand of Plaintiff's case. Accordingly, the undersigned declines to consider Plaintiff's arguments concerning medical source opinions.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED**, and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this **26** day of *February* , 2015.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE